# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ANDY ANDERSON, GARY ACEVEDO, JASON ACOSTA, PETER ALANIS, FRANK ALLBRIGHT, RAMON ALVAREZ, ROBERT ALVES, ANTHONY ANDERSON, JASON ANDERSON, THOR ANDERSON, ET AL** | **CIVIL ACTION**<br><br>**NO.**<br><br>**SECTION** |
| **VERSUS** | **RULE 9(h)** |
| **BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY, BP p.l.c., TRANSOCEAN Ltd., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER, INC., TRANSOCEAN HOLDINGS, LLC, TRITON ASSET LEASING GmbH and HALLIBURTON ENERGY SERVICES, INC.** | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DAMAGES UNDER THE OIL POLLUTION ACT, 33 U.S.C. §2701, et seq. AND THE GENERAL MARITIME LAW

**TO THE HONORABLE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA AND THE JUDGES THEREOF:**

The Complaint of Andy Anderson, et al, a person of majority age, residing at 264 Country View Trail, Pearcy, AR 71964, with respect represents:

1.

In addition to Andy Anderson, named as lead plaintiff herein, remaining plaintiffs, all of whom are persons of majority age or sole proprietorships, limited liability companies, or corporations authorized to and doing business in this judicial district at all material times, are identified in Exhibit A attached to this Complaint and incorporated by reference herein (hereinafter collectively referred to as "Plaintiffs").

2.

Made defendants herein are:

a. BP Exploration & Production, Inc. ("BP Exploration"), a Delaware corporation with its principal place of business in Warenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service (now Bureau of Ocean Energy Management, Regulation and Enforcement) allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252 and drill the "Macondo" well where the blowout occurred and the oil spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990 (OPA), 33 U.S.C. §2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

b. BP America Production Company ("BP America"), a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

c. BP p.l.c., a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. At all material times, BP p.l.c. operated its various business divisions, such as the "Exploration and Production" division in which BP Exploration

and BP America fell, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S.

d. Transocean Ltd. ("Transocean Ltd."), a Swiss corporation that maintains substantial U.S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. At all material times, Transocean Ltd. was a party to the contract with BP America for the drilling of the Macondo well and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

e. Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore"), a Delaware corporation with its principal place of business in Houston, Texas that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

f. Transocean Deepwater, Inc. ("Transocean Deepwater"), a Delaware corporation with its principal place of business in Houston, Texas that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

g. Transocean Holdings, LLC ("Transocean Holdings"), a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was

doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean, Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the blowout occurred and the spill originated. Transocean Holdings was a party to the contract with BP America regarding the charter of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U. S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil and/or diesel fuel spill resulting from the sinking of the vessel Deepwater Horizon.

h. Triton Asset Leasing GmbH ("Triton"), a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, manager owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

i. Halliburton Energy Services, Inc. ("Halliburton"), a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Louisiana. Halliburton provided engineering services, materials, design, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. Halliburton was contractually responsible for the provision of technical advice about the design, modeling, testing, and placement of the cement that was used in the Macondo well. At Macondo, Halliburton was engaged in cementing operations to

isolate the hydrocarbon reservoir zones and seal the bottom of the well against the influx of hydrocarbons.

j.  Halliburton, a division of Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools.  Sperry mudlogging personnel were responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and wellbore pressure fluctuations.  Throughout this Complaint, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

3.

At all material times, Plaintiffs were commercial divers and/or other dive support vessel personnel whose services are essential to commercial diving operations, employed by various companies to perform commercial diving and other underwater services in the navigable waters of the Gulf of Mexico in water depths of typically 300 feet or less.

4.

All Plaintiffs have complied with the suit prerequisite contained in OPA by submitting a "sum certain" and a brief description of the claim as well as some supporting documentation to the Responsible Party, BP Exploration, thereby satisfying the presentment requirement described in 33 U.S.C. §2713. Each claim has either been denied or not settled by any person by payment within 90 days after the date upon which each claim was presented.

5.

All Plaintiffs have complied with the suit prerequisites contained in the Limitation of Liability Act, 46 U.S.C. §30505 et seq., by filing a short form joinder in MDL 2179, which by

agreement of the parties constitutes an answer and claim in the limitation action filed by the Transocean entities named as defendants herein.

## BACKGROUND FACTS

6.      At all times relevant herein, the vessel Deepwater Horizon was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D Deepwater Horizon ("Drilling Contract"), and later amendments to that agreement.

7.      On April 20, 2010, while temporarily abandoning a subsea oil well located at the Macondo prospect site in the area of the Gulf of Mexico known as Mississippi Canyon 252 ("Macondo well"), employees and agents of BP and its subcontractors, including all Transocean and Halliburton entities named as defendants herein (collectively "Defendants"), aboard the vessel Deepwater Horizon lost control of the well and caused a massive blowout.

8.      After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for over twelve weeks, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment, and the economies of the Gulf states and businesses, including Plaintiff and others working in and near the Gulf of Mexico. Meanwhile, BP downplayed the severity of the Spill and was unprepared for the massive clean-up effort required.

9.      Prior to the Spill, Defendants had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance that could lead to loss of life, serious injury, and/or environmental damage, including problems with the

vessel's Blowout Preventer ("BOP"), electronic fire and gas and alarm systems, computer software systems, purge air systems, and other vessel equipment.

10.    Further, Defendants failed to plan, monitor, control, and contain the well, and failed to mitigate the risk and potential damages associated with deepwater drilling.

11.    As described more fully below, the loss of well control and resulting harm was due to the negligent, reckless, callous, and grossly negligent actions on the part of BP and its subcontractors before, during, and after the blowout, including long-standing wanton misconduct by Defendants' corporate management.

## PRE-BLOWOUT FACTS

12.    Defendants struggled with the high temperature, high pressure Macondo well repeatedly before the catastrophic events of April 20, 2010.  In emails weeks before the blowout, BP employees referred to the Macondo well as "crazy," a "nightmare" well, and the "well from hell."

13.    Deepwater Horizon workers struggled to control the problematic well throughout drilling, having suffered numerous kicks, ballooning and lost return events due to the dangerous geological characteristics and narrow drilling margins at Macondo.

14.    As these problems caused the drilling schedule to fall farther behind schedule and over budget, Defendants, and BP in particular, maintained an unreasonable rate of penetration in the drilling effort at Macondo to a point where drilling compromised the BP petrophysics crew's ability to predict down hole conditions and provide guidance on foreseeable hazards.

15.    Further, BP's drilling rate and failure to maintain a safe drilling margin violated federal regulations.  On December 7, 2011, the federal Bureau of Safety and Environmental Enforcement ("BSEE") cited BP for four counts of violation of 30 C.F.R. § 250.427(b) for BP's

knowing failure to suspend drilling operations at Macondo when the federally mandated safe drilling margin was no longer present in the well.

16.    Pursuant to its Drilling Contract, BP was paying approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees. BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

17.    At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees and putting them increasingly over budget. This excess cost put the Macondo project in conflict with BP's recent mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico. In spite of the difficult and dangerous nature of the Macondo well, Defendants made multiple decisions about the drilling plan for purely economic reasons, even though those decisions introduced unnecessary risks and increased the risk of a catastrophic blowout of the well.

18.    Defendants intentionally violated industry guidelines and government regulations, and ignored warnings from their own employees and contractors on the Deepwater Horizon, specifically to reduce costs and save time on the dilatory and over-budget Macondo well.

19.    This emphasis on speed and money over safety led to numerous errors and omissions by Defendants, which, in turn, caused and/or contributed to the blowout and the subsequent Spill. Among these errors and omissions showing callous disregard for safety were the following:

  a.    Decision to use a Long String instead of a Liner

  b.    Decision to use six instead of twenty-one Centralizers

  c.    Decision not to run a Bottoms Up Circulation

d. Decision to pump a cement slurry that was defective in design, inadequately tested, and had a very low probability of success

e. Decision to pump a defective cement slurry without waiting for all necessary cement slurry test results

f. Decision not to run a Cement Bond Log

g. Decision to run a positive pressure test without waiting for the cement to set

h. Decision to run a negative pressure test without waiting for a full risk assessment

i. Decision to displace to seawater before validating that a proper barrier to flow was in place despite clear signs that the cement did not work, zonal isolation and well integrity had not been achieved, and that the hydrocarbons were likely to flow into the well.

j. Decision to order simultaneous operations to occur during critical abandonment phase

20. Prior to beginning cementing operations on the Macondo well production casing, Halliburton was contractually obligated to design and test its cement slurry to ensure it would achieve zonal isolation in the face of the narrow drilling margin and the gaseous nature of the hydrocarbon reservoirs surrounding the well.

21. Halliburton ultimately recommended a foam cement slurry to seal the bottom of the Macondo well. Foam cement is cement that is injected with nitrogen gas on the rig at the time the job is pumped to lower its density. However, Halliburton's base cement contained additives that were inconsistent with foamed cement and violated Halliburton's best practices, technical bulletin, and policies and procedures.

22.    Despite having knowledge that the slurry would likely fail, Halliburton intentionally designed the cement slurry improperly and failed to test its slurry design adequately to ensure that zonal isolation would be achieved at Macondo.

23.    The negative pressure tests conducted on April 20, 2010 were intended to assess the integrity of the defective cement job at the bottom of the Macondo well. The two negative pressure tests accurately yielded abnormal results that were clear signs that the cement did not work, zonal isolation and well integrity had not been achieved, and that the hydrocarbons were likely to flow into the well. Yet, the well was displaced and predictably began to flow shortly thereafter.

24.    Both BP and Transocean have pled guilty to criminal charges for the grossly negligent actions of their employees and agents in failing to properly analyze the results of the negative pressure test and cease operations at that time.

25.    Halliburton was also grossly negligent in ignoring the negative pressure test results and not insisting upon an immediate remedial cement job to correct the evident cement failures.  Halliburton was fully aware of the environmental and safety risks of a failed cement job, yet it did not ensure that the appropriate action be taken to correct the Macondo well's cement seal.

26.    Given the history of the Macondo well, and the reckless decisions Defendants made to save time and money, they should have been particularly attuned to any signs of trouble during the temporary abandonment phase on April 20, 2010. But instead of the requisite vigilance, Defendants failed to monitor the well properly and ignored and/or missed an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

27.     Pressure and flow data from the well in the two hours before the blowout should have put Defendants on notice that there was a problem and that hydrocarbons were leaking into the well. The first indications of hydrocarbons flowing into the well occured at 8:52 p.m., yet went unnoticed by Defendants for forty-nine minutes despite the numerous indicators that the well was rapidly filling with hydrocarbons flowing past the blowout preventer and into the riser, where they had an unimpeded route to the vessel.

28.     During this safety critical time, Halliburton mudlogger Joseph Keith admitted that he left his post in the mudlogger shack. Keith missed key data from the well clearly showing safety critical anomalies, which he never saw or reported to anyone before the surface blowout began.

29.     Throughout the evening of April 20, 2010, the actions of the Deepwater Horizon workers demonstrated a lack of training, lack of situational awareness, and carelessness, all of which caused them to ignore or overlook the harbingers of a blowout.

30.     Defendants' policies and instructions regarding emergency well control procedures were woefully inadequate. The procedures only contemplated relatively small influxes into the well and did not provide guidance on what to do if the initial procedures failed to stop the influx, what to do if hydrocarbons made it past the BOP and into the riser, or whether and when to activate emergency BOP functions.

31.     Due to the mud spurting out of the riser at 9:41 p.m., flow was diverted from the well into the vessel's mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air. This diversion would have been the correct protocol if this incident had been a mere kick. However, for a blowout of this magnitude, diversion through the mud-gas separator only exacerbated the disaster because the gas venting pipes on the mud-gas separator

vented gas back down onto the vessel. When huge volumes of gas began to escape from the well, these goosenecked vents effectively spread highly flammable gas all over the vessel's decks, increasing the likelihood that the gas would find an ignition source.

32.     Investigations and testimony suggest that the initial explosion on the Deepwater Horizon on the night of April 20, 2010 was caused by engine #3, which sucked in the gas flowing down on the decks from the mud-gas separator vents.

33.     The vessel was equipped with gas sensors designed to prevent explosions by initiating a shutdown of certain vessel engines and engine room air intakes when combustible gas was present. The automated features that should have closed the engine room dampeners and the engine's air intake valves upon sensing gas entering the engine room all failed.

34.     At approximately 9:48 p.m., the gas sucked into engine #3 caused the engine to rapidly overspeed. The vessel lost power a minute later, followed by two explosions that ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing from the well. These flow paths continued unabated until the vessel sank on April 22, 2010.

35.     Problems and failures with each of the BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, compromising its powerful shear rams that should have slammed shut, severed the drill pipe, and shut in the well.

36.     The BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence ("EDS"), the automatic mode function ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or autoshear functions. None of these were able to activate the BOP to seal the well.

37.    After the explosion, the vessel crew tried unsuccessfully to activate the emergency disconnect sequence on the Deepwater Horizon's BOP. However, the explosions and fire on the Deepwater Horizon disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS. From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the BOP on the seafloor. On the vessel, these multiplex cables were not protected against explosions or fire. They were damaged by the explosions, effectively disabling the vessel workers' ability to communicate with the BOP.

38.    The Deepwater Horizon's BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality. Transocean's grossly negligent BOP maintenance prevented either of the two pods from completing the AMF sequence on the night of the blowout. Examination and tests performed on the control pods after the disaster found a refurbished and miswired solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. Transocean's BOP maintenance records from 2001 to 2010 indicate that the control pod batteries were not changed annually as recommended by the BOP manufacturer.

39.    BOP maintenance was Transocean's responsibility, but BP was aware of Transocean's infrequent and inadequate maintenance of the device.

40.    Beyond these specific BOP maintenance issues, Defendants were also aware that during the entire duration of operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair. Although the BOP's

manufacturer, Cameron, required manufacturer testing of the device every five years, the Deepwater Horizon's BOP had not been sent to Cameron for inspection since 2000.

41.    A Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, revealed numerous problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves.

42.    Transocean also knowingly failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime. Transocean simply substituted its condition-based maintenance program for the best practices recommended by Cameron and required by federal regulations, and continued to use the BOP.

43.    Defendants' failure to properly maintain the Deepwater Horizon's BOP violated 30 C.F.R. § 250.446(a) by failing to maintain the Deepwater Horizon BOP system in accordance with API RP 53 section 18.10.3, and contributed to the vessel crew's inability to control the Macondo well on April 20, 2010.

44.    Pursuant to 33 C.F.R. 250.107, Defendants were required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition. They were further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations. Defendants' willful violation of these regulatory mandates caused and/or

contributed to the Macondo well blowout and the subsequent explosions, fire, sinking, and Spill.

45.    Decisions, tradeoffs, actions, and inactions by Defendants, including the risky well design, inadequately designed and tested cement, procedures that deviated from industry norms, and failure to identify and train for foreseeable risks all unnecessarily created and enhanced the risks associated with the drilling and temporary abandonment of the Macondo well. This reckless behavior culminated in insufficient well monitoring and failure to recognize the signs of an influx for 49 minutes prior to the blowout. Underlying it all, Defendants' corporate cultures of trading risk identification and safety for speed, production, and profit made this catastrophe inevitable.

46.    Further undermining the safety of those on the rig, discord, recklessness, and gross negligence pervaded the actions of the BP onshore well team.  E-mails from individuals such as Wells Team Leader John Guide and his supervisor, BP's operations leader at Macondo, Operations Manager David Sims, exemplified this callous disregard for human and environmental health and safety.

47.    The substantial evidence of Defendants' misguided priorities and imprudent decisions regarding the Macondo well and the Deepwater Horizon is all part of a long-standing culture of complacency in each Defendant's deepwater drilling operations. Corporate leaders from Houston to London to Switzerland did not take potentially catastrophic risks of deepwater drilling seriously, did not identify foreseeable risks unique to deepwater drilling, and allowed those risks to result in the April 20, 2010 disaster.

## POST-BLOWOUT FACTS

48.     On the night of April 20, after the explosions ignited the vessel, the resulting gas-fueled fire on the Deepwater Horizon raged for two days until she finally sank on April 22, 2010. The Deepwater Horizon was connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe, and as the vessel sank to the seafloor, it dragged the riser down with it, bending and breaking the pipe before finally tearing away from it completely. Immediately oil and natural gas began to gush from the open end of the riser and from at least two places along its twisted length.

49.     For 87 days, the gushing oil and gas continued unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone and ultimately the entire Gulf of Mexico.

50.     From the outset, BP intentionally downplayed and concealed the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day. An internal BP document proves that the company's own analysis had shown that the rate of oil flow could reach as high as 100,000 barrels, or 4,200,000 gallons, per day.

51.     Despite known existing technology and methods, BP Chief Operating Officer Doug Suttles admitted that as of April 20, 2010, BP did not have a response plan with "proven equipment and technology" that could contain the Macondo well. BP p.l.c. CEO Tony Hayward stated that "BP's contingency plans were inadequate," and that the company had been "making it up day to day." In its official statement, BP made the same admission: "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

52.     Upon information and belief, BP actually hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable

about deepwater blowout response told BP how to kill the well in June 2010. But BP chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP hoped to retap the Macondo well and its massive reservoir, they intentionally ignored expert advice that could have killed the well many weeks earlier.

53.     These gross failures and intentional acts ensured that this Oil Spill became the largest environmental disaster in the history of the United States.

54.     Due to the events, actions, and inactions of Defendants described herein, commercial offshore activity in the Gulf of Mexico and surrounding waters ceased, and individuals and entities that rely on the use of the Outer Continental Shelf and its resources to generate revenues suffered both immediate and long-term economic harm.

## FIRST CAUSE OF ACTION

### 55.

The April 20, 2010 blowout of the Macondo well and consequent explosion, fire, vessel sinking and massive oil spill prohibited these Plaintiffs from engaging in their vocation of commercial diving and other related services in the navigable waters of the Gulf of Mexico in water depths of typically 300 feet or less.

### 56.

Defendant BP is not entitled to limit their liability under Section 2704(a) of OPA because the Oil Spill was proximately caused by its gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

### 57.

Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of

Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under OPA.

58.

Commencing on April 20, 2010 and continuing through today and into the foreseeable future, these Plaintiffs have suffered and will continue to suffer economic damages in the form of past lost wages, future lost earnings due to reduced earning capacity from commercial diving and other related services in the Gulf of Mexico, and lost found and fringe benefits due to the April 20, 2010 casualty described herein, in amounts to be proven for each individual Plaintiff at trial of this cause.

59.

There were no other events, occurrences, actions on inactions that caused these Plaintiffs losses, no superseding or intervening cause(s) of these Plaintiffs losses, and no other events, occurrences, actions or inactions that factually or legally relieve or reduce BP Exploration's strict liability or the damages owed to these Plaintiffs under OPA.

60.

Jurisdiction of this first cause of action against BP Exploration is based upon The Oil Pollution Act, 33 U.S.C. §2701, et seq.

## AND FOR A SECOND CAUSE OF ACTION

61.

Plaintiffs re-aver and re-allege all foregoing paragraphs in this Complaint for Damages as if re-pled in their entirety.

62.

Plaintiffs' economic damages described herein were caused by the negligence and want of reasonable care under the circumstances of the Macondo well project by Defendants leading up to and during the completion phase of the well in the following particulars:

a. Failing to properly plan the production casing and completion phases of the well in light of the unreasonably small drilling margin and extensive history of ballooning, kicks and lost returns;

b. Failing to achieve zonal isolation through a good and proper cement job utilizing the appropriately designed and tested lead, foam and tail cement;

c. Failing to recognize and appropriately respond to obvious signs of lack of well integrity and control following completion of the Macondo production casing cement job;

d. Failing to control the Macondo well during completion;

e. Failing to timely take reasonable, necessary and readily available steps to control the influx of gas and hydrocarbons through the well, blowout preventer, riser and onto the vessel Deepwater Horizon;

f. Failing to insure that the vessel's crew was trained and her equipment was maintained and capable of appropriately responding to the unwanted influx of gas and hydrocarbons to prevent or mitigate a potential explosion and fire aboard the vessel; and

g. Failing to prevent the explosions and fire aboard the vessel that ultimately caused her to sink.

63.

This cause of action, grounded in the general maritime law of the United States, is not barred by the case of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), as these Plaintiffs' jobs and earned income are directly dependent upon entering into and swimming in the navigable waters of the Gulf of Mexico, thereby making these Plaintiffs, the vast majority of whom are seamen under the Jones Act, 46 U.S.C. §30104 et. Seq., subject to the perils of the sea and uniquely situated in the same fashion if not more so than the commercial oystermen, shrimpers, crabbers and fishermen whose purely economic loss claims are a judicially recognized exception to the "*Robins Dry Dock Rule*."

64.

Jurisdiction of this second cause of action against the aforesaid defendants is based upon the general maritime law of the United States.

## **AND FOR A THIRD CAUSE OF ACTION**

65.

Plaintiffs re-allege and re-aver each and every allegation of fact and law in the preceding paragraphs as if re-pled in their entirety.

66.

The conduct of all named defendants herein in causing the April 20, 2010 Macondo well catastrophe and the damages resulting from said casualty described herein was willful, wanton and reckless, said conduct being motivated by management's reckless failure to identify, assess and mitigate known deepwater drilling risks and by Defendants' desire to save time and money

at the expense of safety and the environment, thereby entitling these Plaintiffs to punitive damages in an amount to be determined by this Honorable Court.

67.

This cause of action, grounded in the general maritime law of the United States, is not barred by the case of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), as these Plaintiffs' jobs and earned income are directly dependent upon entering into and swimming in the navigable waters of the Gulf of Mexico, thereby making these Plaintiffs, the vast majority of whom are seamen under the Jones Act, 46 U.S.C. §30104 et. Seq., subject to the perils of the sea and uniquely situated in the same fashion if not more so than the commercial oystermen, shrimpers, crabbers and fishermen whose purely economic loss claims are a judicially recognized exception to the "*Robins Dry Dock Rule*."

68.

Jurisdiction of this third cause of action against the aforesaid defendants is based upon the general maritime law of the United States.

69.

Plaintiffs bring all claims and causes under Federal Rule of Civil Procedure 9(h) and demand a trial by judge on said claims and causes.

**WHEREFORE**, based on the foregoing, Plaintiffs pray for judgment in their favor and against defendants BP Exploration & Production, Inc., BP America Production Company, BP p.l.c., Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, Triton Asset Leasing GmbH and Halliburton Energy Services,

Inc. for compensatory damages as alleged herein in an amount reasonable under the circumstances of this cause, fur punitive damages in an amount to be awarded by this Honorable Court, for legal interest at the maximum allowable rate on those amounts for which Plaintiffs are entitled to obtain legal interest, for all reasonable claim preparation expenses, for litigation costs, and for any additional general and equitable relief as the facts of this cause may require.


Respectfully submitted,


/s/ Paul M. Sterbcow
PAUL M. STERBCOW, T.A. (#17817)
IAN F. TAYLOR (#33408)
JESSICA IBERT (#33196)
Lewis, Kullman, Sterbcow & Abramson
601 Poydras Street, Suite 2615
New Orleans, Louisiana 70130
(504) 588-1500
(504) 588-1514                Facsimile
sterbcow@lksalaw.com
itaylor@lksalaw.com
jibert@lksalaw.com

/s/ Bobby J. Delise
BOBBY J. DELISE (#04847)
Delise & Hall
7924 Maple Street
New Orleans, Louisiana 70118
(504) 836-8000
bjdelise@gmail.com


**PLEASE SERVE:**

**BP EXPLORATION & PRODUCTION, INC.**
Through their registered agent:
CT Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA 70808

**BP AMERICA PRODUCTION COMPANY**
Through their registered agent:
CT Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA 70808

**BP, PLC**
North American Headquarters
28100 Torch Parkway
Warrenville, IL 60555-3938
Through the Louisiana Long Arm Statute, LSA-R.S. 13:3201,
pursuant to Section 3204 of Title 13

**TRANSOCEAN HOLDINGS, LLC.**
Through its Attorney of Record:
Kerry J. Miller, Esq.
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

**TRITON ASSET LEASING GMBH**
Through its Attorney of Record:
Kerry J. Miller, Esq.
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

**TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.**
Through its Attorney of Record:
Kerry J. Miller, Esq.
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

**TRANSOCEAN DEEPWATER, INC.**
Through its Attorney of Record:
Kerry J. Miller, Esq.
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

**HALLIBURTON ENERGY SERVICES, INC.**
Through its Attorney of Record:
Donald E. Godwin, Esq.
Godwin Lewis
1201 Elm Street

Suite 1700
Dallas, Texas 75270

**PLEASE WITHHOLD SERVICE**

**TRANSOCEAN, Ltd.**